**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| **PRIMED, INC.,** | § | |
| | § | |
| **Petitioner,** | § | |
| **v.** | § | **CASE NO. : 11-CV-2002-T-33AEP** |
| | § | |
| **DALLAS GENERAL LIFE INSURANCE** | § | |
| **COMPANY and JEFFERSON LIFE** | § | |
| **INSURANCE COMPANY,** | § | |
| | § | |
| **Respondents.** | § | |

## RESPONDENTS' MOTION TO VACATE THE ARBITRATION AWARD

Respondents, Dallas General Life Insurance Company (Dallas General) and Jefferson Life Insurance Company (Jefferson), move to vacate the arbitration award on the grounds that the arbitrator exceeded his powers and that the underlying contract is illegal.

## MEMORANDUM OF LAW

## PROCEDURAL HISTORY

On November 1, 2003, PriMed Inc. (PriMed) and Dallas General entered into an agreement for PriMed to provide access for plan members to providers of medical services. (App. 000013-23). The PriMed Program offered members the right to receive medical services from those providers at a discount. PriMed and Dallas General later entered into an Addendum to the Agreement which provided that Jefferson was to assume the obligations of Dallas. The agreement had an arbitration clause and provided that Florida law would govern. PriMed instituted an arbitration proceeding alleging that Dallas and Jefferson had breached the agreement by failing to enroll members in PriMed's insurance program.

On March 19, 2010, the Arbitrator entered an Order on Liability Phase of Arbitration Hearing. (Dkt. 1, Ex. 3). On June 30, 2011, the Arbitrator entered an Arbitration Award as

to Damages. (Dkt. 1, Ex. 4).  The award provided that counsel for PriMed should compute the pre-judgment interest to be awarded and submit the computation to the Arbitrator in a proposed amended arbitration award.   Dallas General and Jefferson filed a Motion for Clarification of Damage Award on July 22, 2011. (Dkt. 1, Ex. 5).  On August 24, 2011, the Arbitrator entered an Amended Arbitration Award As To Damages. (Dkt. 1, Ex. 8).  PriMed filed its Petition to Confirm Arbitration Award with this Court on September 1, 2011. (Dkt. 1)

The Agreement between the parties provided that it would be governed by Florida law.  Because the Federal Arbitration Act (FAA) does not prevent the enforcement of agreements to arbitrate under different rules than those stated in the FAA itself, the FAA does not preempt Florida law, including the period prescribed by the Florida Arbitration Code (FAC) to vacate an arbitration award.  Fla. Stat. §682.13(2) provides a party 90 days to file an application to vacate, modify or correct an arbitration award.  The FAA, 9. U.S.C. §9 et. seq., provides a party may move to vacate an award within three months after the award is filed.  This motion to vacate is filed within 90 days and three months of the arbitrator's award.

## <u>SUMMARY OF ARGUMENT</u>

An unusual intersection of laws underlies this jurisdictional deficit.  Normally, the FAA would invalidate a law prohibiting arbitration.  The McCarran-Ferguson Act (sometimes herein the "MFA"), 15 U.S.C. §1012, however, "reverse preempts" the FAA with regard to a Florida statute regulating insurance.  Because that same Florida statute overrides the FAC as a more specifically applicable statute in this situation, neither the FAA nor the FAC apply here in the manner that they normally would.   The FAA and the FAC do

not override the State of Florida's prohibition against PriMed's commencement of its arbitration action.

It is grounds under both the FAA and the FAC for vacatur of an award if the arbitrator exceeded his powers.  Arbitrators draw their power from the agreement of the parties to arbitrate  Here, however, because a Florida statute prohibited the arbitration, the arbitrator could draw no authority from the parties' agreement.  Put differently, PriMed had no power to vest in the arbitrator any authority by way of its agreement to arbitrate against Dallas General.  Because the arbitrator had no authority, he "exceeded his powers," and his award should be vacated by vacatur standards of the FAA or the FAC.

PriMed's arbitration award also fails because the underlying contract was illegal. The parties' contract had a choice of law provision choosing Florida law, and the parties were litigating under Florida procedural law, so that this Court should use the vacatur standard of the FAC. Florida law requires a court to determine the legality of the underlying contract before deciding whether to confirm an award.

## **FACTUAL BACKGROUND**

PriMed does business in Florida as a foreign corporation.  Edward Thomas is PriMed's sole officer and employee, and operated PriMed out of his garage near St. Petersburg, Florida.[1]  Since 2000, PriMed's sole business was the administration of a "discount medical health plan" (the PriMed Program).[2]  The discount medical health plan administered by PriMed is a 'private label product' created by Coverdell f/k/a Best Benefits

---

[1] Deposition of Edward Thomas ("Thomas Dep.") at 4:20-5:23, App. 000002-3.
[2] *Id.* at 5:24-7:10, App. 000003-4.

(Coverdell) and licensed to PriMed.[3]  The Coverdell program provides access to a network of physicians (the physician network) maintained by yet another company, Beech Street, each of whom has contracted to provide discounted health services.[4]

As noted above, PriMed entered into an Agreement with Dallas General on November 1, 2003.[5]  Under the Contract, Dallas General was to offer to its "members" an option to enroll in the PriMed Program when purchasing Dallas General's "ValueMed" Medicare supplement policy.  In exchange for providing these members with access to the physician network, PriMed was to receive payment from Dallas General for those members enrolled in the PriMed Program.  The Contract required each party to "comply with all applicable federal, state or local laws or regulations that apply to their business operations, and to maintain all federal, state or local licenses or permits required by law and necessary to carrying out the provisions of this Agreement."[6]  The initial term of the Contract was to run through October 31, 2006.  On January 26, 2006, PriMed consented to the transfer of all of Dallas General's interest in the Contract to Jefferson Life.  The Contract contained a "Dispute Resolution" section, which included a choice of law provision choosing Florida law and an arbitration provision.[7]

On March 30, 2004, PriMed began receiving fee payments under the contract.  These peaked on May 4, 2005, when approximately 450 of Dallas General's insureds were enrolled in the PriMed program.[8]  Dallas General was then placed under Administrative Oversight by

---

[3] *Id*. at 45:18-45:21 and 50:6-50:21, App. 000006 and App. 000011.
[4] *Id.* at 48:21-49:9, App. 000010-11.
[5] Agreement between PriMed and Dallas General, at p.1, App. 000013.
[6] Agreement at §9, App. 000016.
[7] Agreement at §19, App. 000018.
[8] *See* Fee Payments received by PriMed, Inc., App. 000024.

the Texas Department of Insurance (The TDI).[9] The operation of Dallas General became subject to oversight by a TDI representative, Solomon Wolde-Miriam.  Wolde-Miriam instructed Dallas National to remove the PriMed materials from its insurance products and to issue a letter to its insureds advising them that they had a choice as to whether they wished to remain enrolled in the PriMed Program.[10]

On October 15, 2007, PriMed began the arbitration by filing its Statement of Claim with the Arbitrator.[11]  The Statement of Claim alleged that Dallas General and Jefferson Life had breached the Contract by terminating "members" from the PriMed Program, by failing to continue to offer the PriMed Program to its "members," and by using one or more of PriMed's vendors.  An exhibit to the Statement of Claim pinpointed the date of the breach as May 2005, the month that Wolde-Miriam had given the instructions to Dallas National.

> For reasons that are not clear to us, in May, 2005, Dallas General apparently dropped many of its members from the PriMed program.  We have since learned that at approximately the same time, Dallas General changed its application form its members, eliminating the PriMed program as an available option.[12]

PriMed sought to recover damages for these alleged breaches.  Dallas General and Jefferson Life argued, in part, that PriMed was prohibited from seeking damages because it was not licensed to offer a discount medical plan pursuant to Florida law.[13]

In 2004, Florida had enacted as part of its insurance laws a statutory scheme to regulate "prepaid limited health service organizations and discount medical plan

---

[9] *See* (Dallas General and Jefferson Life's TDI History), App. 000025.
[10] Hagan Dep. at 17:17-19:25, App. 000034-38.
[11] PriMed's Statement of Claims, App. 000039-57.
[12] Letter from John E. Johnson to a John W. Hagan and others, dated Oct. 3, 2006, Ex. C to PriMed's Statement of Claim, App. 000056.
[13] See Respondents' Motion for Summary Disposition, App. 000089-97, Respondents' Pre-Hearing Arbitration Br., App. 000098-109, and Respondents' Closing Br., App. 000110-132.

organizations."   Fla. Stat. §636.202 et seq.  Section 636.202 defines "discount medical plan organizations" and "marketers."   Section 636.204 requires that discount medical plan organizations, among other things, to "be licensed by the office as a discount medical plan organization . . . ."[14]   Section 636.244 provides that unlicensed discount medical plan organizations are to be treated as if they were unauthorized insurers for purposes of §§ 626.901-626.912.  Fla. Stat. §626.903. establishes that "unauthorized insurers" — which pursuant to §636.244 would include unlicensed medical plan organizations — may not bring any suit, action or proceeding in Florida to enforce any claim arising out of any insurance transaction.

To operate an unlicensed discount medical plan or to aid and abet another in doing so is a felony under Florida law. Fla. Stat. §636.238.  PriMed admits that it did not and has never held a license with the Florida Department of Insurance or the Office of Insurance Regulation.[15]  PriMed contends that discount plans such as the PriMed Program were "not regulated as such as it needed a license to hold to do that" and that Coverdell had assured him that licenses were not required.[16]

PriMed later took the position that it was a "marketer," as defined by statute,  rather than a "discount medical plan," and thus PriMed did not need a license.  To qualify as a "marketer," however, PriMed must have limited its activities to its efforts to "market or distribute" the plan and in no way "operate" the plan. Fla. Stat. §636.202(3).  Even a cursory review of the Contract establishes unequivocally that PriMed assumed duties and

---

[14] The statute also provides that licensure may be pursuant to Ch. 624 (as an "insurer") or Ch. 641 (as a "Health Care Service Provider"), though neither reference is material here.
[15] Thomas Dep. at 104:5-104:11, App. 000012; Hearing Tr. at p. 231: 16-17; App. 000155 (Florida Office of Insurance Regulation showing PriMed, Inc. is not licensed to sell discount medical cards.), App. 000058-59.
[16] Thomas Dep. at 104:12-17, App. 000012.

responsibilities under the Contract (discussed *infra*) that can only be classified as "operational" in nature as contemplated by the Discount Medical Plan Organization (DMPO) statutes. Having contracted to at least in part "operate" the PriMed program, PriMed is unable to escape its status under Florida law as a "discount medical plan."

PriMed's status as a mere marketer, even if true, would not have allowed it to bring the arbitration, or made its Contracts with Dallas General and Jefferson legal. Even if the Arbitrator found that PriMed was a mere marketer, it was nonetheless relying on the license that Coverdell was required to hold as a DMPO operator:

> Q.    So from your position, the license that you're operating under is the Best Benefits license?
>
> A.    Yes. At that time. Today it's Coverdell.[17]

Yet Coverdell itself was unlicensed during the critical month of May, 2005. In September, 2006, the Financial Services Commission, Florida Office of Insurance, Market Investigations issued a "Market Conduct Final Examination Report" that established that between April 1, 2005, the effective date of Chapter 636 and its licensing requirement, and June 8, 2005, the licensure date for Coverdell/Best Benefits, some 3,499 members were enrolled through its 'private label' marketers—including PriMed.[18] As a result, on December 6, 2007, Coverdell entered into a Consent Order with the Florida Department of Insurance, in which Coverdell acknowledged, among other things, that it had violated §636.204(1) for conducting business as a discount medical plan organization prior to licensure.[19]

---

[17] Hearing Tr. at 232:9-20 (emphasis added), App. 000156-000157.
[18] Market Conduct Final Examination Report at p. 3, App. 000137.
[19] Consent Order dated December 6, 2007, pp. 1-2 (emphasis added), App. 000140-141. This Consent Order was Exhibit 2 to Respondents' Joint Post-Hearing Brief Regarding Liability (App. 000110-0001320), see App.

At the hearing on the liability phase of the arbitration, Mr. Thomas testified on behalf of PriMed that "Best Benefits made application in December of 2004.  I verified that with the State of Florida. And their process was ongoing and the *State of Florida allowed them to continue to market until it was finished and they were fully appointed*, and I want to say that happened in...I want to say July or August of 2005. It took the State that long. And the reason, the State told us, it took that long is there was a tremendous influx of companies all at one time and they didn't get them all out."[20]  The testimony of Mr. Thomas *directly contradicts* the State of Florida's findings and conclusions regarding the liability of Coverdell/Best Benefits in the Market Conduct Report.   At a minimum, the Arbitrator was thus obligated to address that issue and resolve the patent conflict between PriMed's testimony and the records of the State of Florida. Evidence and argument regarding these issues were submitted to the Arbitrator in the liability phase of the arbitration, and again, with the information concerning Coverdell's unlicensed status in May 2005, after the end of the hearing.[21]  Significantly, the Arbitrator has never issued a final ruling (reasoned or otherwise) on this licensing issue and the basis for awarding damages to PriMed for what is conduct prohibited by statute.

## ARGUMENT

I.      **Under either the FAA or the FAC, the Arbitrator exceeded his powers because Florida Statutes §626.903 prohibited PriMed, as an unlicensed insurer, from maintaining any proceeding in Florida to enforce the contract.**

This case presents a unique issue relating to the intersection of four different laws, the FAA, the FAC, the MFA and §626.903.

---

000117.

[20] Hearing Transcript at p. 232:9-17; App. 000157 (emphasis added).

[21] Respondent's Joint Post-Hearing Br. Regarding Liability at App. 000115-000119.

Either the FAA or the FAC governs the arbitration that is the subject of this proceeding, and under both of them, review of arbitral awards is extremely limited. The McCarran-Ferguson Act provides that federal laws which do not relate specifically to insurance — and that includes the FAA — cannot impair state laws intended to regulate the business of insurance. 15 U.S.C. §15(b). Fla. Stat. §626.903, in conjunction with §636.244 providing that unlicensed discount medical plans such as PriMed were to be treated as unlicensed insurers for purposes of §626.903, prohibited PriMed from bringing the arbitration in Florida. Whereas the FAA arguably trumps such a state law, here it cannot pursuant to the MFA. 15 U.S.C. §15(b). Thus, an arbitrator conducting an arbitration in Florida that is expressly prohibited by Florida law did not have jurisdiction.

One of the grounds for vacating an arbitration award under the FAA is that "the arbitrators exceeded their powers . . . ." 9 U.S.C. §10(a)(4). Normally, an arbitrator exceeds his powers "only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" *Stolt-Nielsen S.A. v Animal Feeds Int'l Corp,* 130 S.Ct. 1758, 1762 (2010). Yet the statutory language has a plain meaning, and that meaning should be applied to the unusual facts and unique intersection of state and federal laws that this particular case presents. Customarily the arbitrator derives his authority from the agreement of the parties to arbitrate. *See id*. at 1774. The arbitrator in this case did not exceed his powers by addressing issues that the operative document did not purport to give him power to decide. Rather, the arbitrator exceeded his powers because one of the parties, PriMed, had no authority through the agreement to grant the arbitrator the power to decide its own claims. This is a different situation from the arbitrator deciding the legality of the underlying contract. It is an issue of whether the

arbitration itself was permissible under state law and thus a jurisdictional issue.   As a jurisdictional issue it can be raised at any time, but was in fact raised below in the arbitration itself.

**A.  The McCarran-Ferguson Act reverse-preempts the FAA, so that §626.903 prohibited PriMed from bringing the arbitration.**

**1.  The FAA cannot "invalidate, impair, or supersede" any Florida law meant to regulate the business of insurance.**

Congress has left no doubt that states have the power to regulate insurance, and the McCarran-Ferguson Act provides that no federal law shall impair state laws regulating the business of insurance unless the federal law specifically relates to the business of insurance. 15 U.S.C. §1012.   The FAA does not "specifically relate" to the business of insurance. *McKnight v. Chicago Title Ins. Co., Inc.*, 358 F.3d 854, 857 (11th Cir. 2004) ("The parties and we agree that the Federal Arbitration Act does not itself specifically relate to the business of insurance.").   The effect of the MFA on the FAA is therefore one of "reverse preemption" with regard to state laws regulating the business of insurance.

The Supreme Court of Georgia explained the MFA's reverse preemption of the FAA in *Love v. Money Tree, Inc.*, 614 S.E.2d 47 (Ga. 2005).   In that case, the appellee The Money Tree, Inc. ("Money Tree") was licensed to make consumer loans in Georgia.   The appellants had signed, in addition to loan documents which contained an arbitration clause, a form which provided an opportunity for the appellants to buy accidental death and dismemberment insurance and/or automobile club membership.   The automobile club membership was financed by the Money Tree.   The appellants had chosen the automobile club membership.   When they defaulted on their loans, a lawsuit ensued with appellants bringing claims alleging that Money Tree was involved in a fraudulent scheme to force

10

borrowers to purchase automobile club memberships in order to obtain a loan.  Money Tree moved to compel arbitration based on the arbitration clause in the loan documents.  The state trial court granted that motion, and the court of appeals affirmed.  The Georgia Supreme Court reversed.

The *Love* court held that auto-club memberships qualified as insurance under Georgia law.  It recognized that the MFA prohibited the application of any federal statute when it would "'invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance.'" *Id.* at 479.  A Georgia statute provided that agreements to arbitrate disputes regarding "contracts" of insurance were invalid in Georgia.  The *Love* court found "persuasive" the reasoning of "[n]umerous courts" which had "consistently held that such State laws have been enacted for the purpose of regulating insurance; that application of the FAA would impair those laws; and that the MFA thus precludes the FAA from preempting those State laws." *Id.*  The court in *Lawson v. Life of the South Ins. Co.*, 2010 WL 1416551 (M.D. Ga. 2010) followed the reasoning of *Love*.  In *Lawson*, the plaintiffs took out a loan to finance a car.  The installment loan agreement terms were included in the sales contract which also contained an arbitration agreement.  Separately, there was an insurance certificate evidencing the plaintiffs' purchase of an optional credit life insurance policy to cover the balance of the car loan in the event of Plaintiffs' death.  There was no arbitration clause in the certificate of insurance.  Plaintiffs argued that the same Georgia statute prohibiting the arbitration of insurance disputes precluded arbitration of the dispute.  The defendant argued that the loan agreement with the arbitration clause was "not a contract of insurance," and thus was not subject to the Georgia statute.  *Lawson* at *2.  The *Lawson* court concluded that the MFA preempted the FAA in

that case, and that Georgia law prohibiting arbitration in insurance disputes applied.  *Id.* at 4-6.

### 2. Florida Statutes §626.903 prohibited PriMed from bringing the arbitration in Florida.

Section 626.903 is a statute intended to regulate the business of insurance.  As noted above, it prohibits the filing or maintaining of "any suit, action or proceeding" by an "unauthorized insurer."  The Florida Legislature, as part of its scheme of laws regulating insurers, has determined that unlicensed discount medical plan operators such as PriMed are to be treated as unauthorized insurers for purposes of §626.903.  Fla. Stat. §636.244.

It is undisputed that PriMed has never held a license with the Florida Department of Insurance or the Office of Insurance Regulation.[22]  PriMed's position was that it was a "marketer" rather than a "discount medical plan," and thus did not need a license.[23]  But to qualify as a "marketer," PriMed would have had to only "market or distribute" the plan and in no way "operate" it.  As noted above, §636.202(3) defines a "marketer" as a person or entity which "does not operate a discount medical plan."

The Contract establishes that PriMed had the duty and responsibility to administer the program as set for in the recitals,[24] develop promotional materials,[25] recommend changes in the program,[26] and warrant the competency of the physicians in the PriMed Program network.[27]  If PriMed's role was limited to marketing and distribution and another entity was responsible for operation of the program, PriMed could not have warranted that (1)

---

[22] Thomas Dep. at 104:5-104:11, App. 000012; Hearing Tr. at p. 231: 16-17; App. 000156 (Florida Office of Insurance Regulation showing PriMed, Inc. is not licensed to sell discount medical cards.), App. 000058-59.
[23] Hearing Tr. at p. 231, App. 000156.
[24] App. 000013-23.
[25] *Id* at ¶ 1.b, App. 000013.
[26] *Id* at ¶ 1.c, App. 000013.
[27] *Id*. at ¶ 1.a, App. 000013 and Ex. A to the Contract, App. 000020.

"reputable suppliers" would provide benefits: (2) "changes in suppliers shall not result in a substantial change in the benefit itself;" or (3) "vendors selected to provide benefits under the program shall be competent, reliable and provide the benefits in a manner that equals or exceeds the goods and services provided by suppliers of similar benefits." *See* Agreement between PriMed and Dallas General, Ex. A, App. 000020.  PriMed cannot claim that it did not "operate" the Plan when the Contract plainly called for it to actively administer and deliver the services described in the Contract.  Thomas, who as the sole officer and "chief cook and bottle-washer" of PriMed, worked out of a garage, was clearly "operating" the plan in Florida.[28]

Even if PriMed could be properly termed a "marketer" rather than a discount medical plan, the discount medical plan operator from whom it obtained the PriMed program, Coverdell, would need to be licensed.  However, Coverdell operated without a license from the effective date of the licensing law, April 1, 2005, until June 8, 2005.[29]  It was during this period, in May 2005**,** that the operation of Dallas General was under the oversight of TDI representative, Solomon Wolde-Miriam, and he instructed Dallas National to remove the PriMed materials from its insurance products.[30]  Consequently, PriMed asserted that in May, 2005, Dallas General had breached the Contract by ceasing to offer the PriMed program and sending letters to its agents advising them they would no longer include PriMed in their product offering.[31]  Thus, even if PriMed had been a marketer rather than an operator, Coverdell did not have the required license and was operating without a license in violation of Florida law.

---

[28] Thomas Dep. at pp. 4:20-5:18, App. 000002-3.
[29] Market Conduct Final Examination Report. at p. 3, App. 000137.
[30] Hagan Dep. at 17:17-19:25, App. 000034-38.
[31] See Claimant's Arbitration Br. at p.3, App. 000147.

### 3. Florida law prohibited PriMed from bringing the arbitration in Florida, and hence the arbitrator in Florida had no jurisdiction, and "exceeded his powers" in making an award.

The Contract expressly provides that "Arbitration shall take place in Tampa, Florida."[32]  The arbitration clause required PriMed to bring its arbitration in the very state where PriMed was forbidden, because of its unlicensed status, from "instituting, filing, maintaining or causing to be instituted, filed or maintained" any proceeding to enforce its contract claims.  Fla. Stat. §626.903.   Once a dispute arose, PriMed had no authority or power to commence an arbitration.   It is said that arbitrators derive their power from the agreement to arbitrate, but ultimately they derive their power from the parties who make the agreement.  *Stolt-Neilsen*, 130 S.Ct. at 1763 ("private agreements to arbitrate are enforced according to their terms" and parties are "generally free to structure their arbitration agreements as they see fit," including agreements as to the "issues arbitrated, the rules under which an arbitration will proceed . . .[and with whom] they choose to arbitrate their disputes").   A party prohibited by statute from bringing an arbitration action in Florida, however, could not, by mere reliance on an arbitration clause in that contract, empower an arbitrator in Florida to decide a dispute that is prohibited by that party's unlicensed status.  And an arbitrator, in the face of that prohibition, has no power at all when reverse-preemption under the McCarran Ferguson Act does not permit application of the FAA to "impair" that state law prohibition.  The situation is analogous to those in *Love v. Money Tree, Inc.* and *Lawson v. Life of the South Ins. Co.*, where the lenders could not compel arbitration despite the FAA because a Georgia state law regulating the business of insurance prohibited them from doing so.

---

[32] Contract at §19(c), App. 000018.

Normally, an arbitrator exceeds his powers under the FAA only when he "strays from interpretation and application of the agreement" and effectively dispenses "his own brand of industrial justice." *Stolt-Nielsen, 130 S.Ct. at* 1767 (vacating arbitration award where what the arbitration "panel did was simply to impose its own view of sound policy regarding class arbitration"). Yet this case presents the question of whether an arbitrator "exceeded his powers" in an unaccustomed context. Here, the arbitrator necessarily "exceeded" his power because he arbitrated a dispute in Florida that was prohibited by a party (PriMed) expressly from doing so under a Florida law regulating insurance. Confirmation under the FAA of PriMed's arbitration award violates §626.903 and most impairs the operation of the statute.

**B.  If the FAC applies, the Arbitrator also exceeded his powers.**

The standard for vacatur under the FAC is set forth in Fla. Stat. §682.13 which provides that an award may be vacated when "[t]he arbitrators or the umpire in the course of her or his jurisdiction exceeded their powers." §682.13(c). Just as the MFA reverse preempts the FAA, so too does §626.903 trump any conflicting provisions of the FAC. Section 626.903, taken in conjunction with §636.244, specifically addresses the precise situation before us: whether an unlicensed medical discount plan operating in Florida can bring an arbitration in Florida to enforce its contract rights. It is a fundamental rule that "where two statutory provisions are in conflict, the specific provision controls the general provision." *Murray v. Mariner Health*, 994 So.2d 1051, 1061 (Fla. 2008). Thus, to the extent that §626.903 conflicts with the provisions of the FAC, it governs. Under Florida law as well as under the FAA, the arbitrator necessarily "exceeded his powers" because he had no jurisdiction.

II.     **The FAC governed the arbitration, and Florida law prohibits Florida courts from confirming awards without determining the legality of the contract.**

Even if the Court determines that the arbitrator had jurisdiction and did not exceed his powers, the Court must determine the legality of the underlying contract. Florida law provides an independent basis.

A. **The parties understood that Florida procedural law, and hence the FAC, governed the arbitration.**

The underlying contract in this case expressly states that Florida substantive law will apply and that the parties agreed to abide by the FAC.[33]  *See e.g., Volt Info. Scis. Inc. v. Bd. of Trs.*, 489 U.S. 468, 470 (1989) ("[a]rbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit" and where the agreement provides for arbitration and a specific choice of law provision the FAA cannot be relied upon to upend the intent of the parties with regard to application of state law and rules of arbitration).  When in October of 2006, PriMed first sought to compel arbitration, it brought suit in a Florida State Court, in Hillsborough County.[34]  The original arbitrator, Cary Singletary, served in that capacity until June, 2007, until his updated disclosures resulted in Dallas General and Jefferson objecting to him as arbitrator.  It was in the state court action that PriMed moved to compel the selection of a new arbitrator. [35]

When the hearing before the new arbitrator, Gaspar J. Ficarotta, was conducted, counsel for PriMed, in discussing an evidentiary point, indicated to the Arbitrator that Florida *procedural law* applied to the proceedings.

---

[33] PriMed Contract at §19(a), App. 000018.
[34] Complaint in original action, App. 000072-88.
[35] PriMed's Motion to Compel Selection of Arbitrator, App. 000062-71.

> The case law in Florida -- **and Florida law governs this case with respect to the issues that we're dealing with** -- is pretty clear that when a party has a duty to have particular documents and they don't produce them or there is evidence that they have destroyed them, that there is an adverse inference, that the opposing party is entitled to, that the documents would in fact be bad for the opposing party.[36]

With regard to this procedural question, PriMed's counsel cited Florida cases interpreting Fla. R. Civ. P. 1.380, *Nationwide Lift Trucks v. Smith*, 832 So.2d 824 (Fla. 4th DCA 2002) and *Martino v. Wal-Mart Stores, Inc.*, 908 So.2d 342 (Fla. 2005).[37]   These representations by PriMed's counsel were consistent with the understanding of both sides that Florida law governed the arbitration.

Yet, once the Arbitrator issued the award, PriMed did not return to state court to have it confirmed, but instead filed this Petition to Confirm Arbitration Award, where it now insists that the FAA, not the FAC, governs.   Respondents believe that PriMed does so in order to take advantage of the decision in *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321-24 (11th Cir. 2010), where the Eleventh Circuit interpreted *Hall Street Assocs., L.L.C. v. Mattel, Inc*., 552 U.S. 576 (2008) as eliminating three previously recognized non-statutory grounds for vacatur of arbitration awards.

Respondents do not dispute that in general, absent an agreement of the parties, the FAA governs arbitrations where the underlying contract contemplates transactions in interstate commerce. Here, however, that general principle is inapplicable because of the parties' mutual understanding, as reflected in the transcript, that Florida's procedural law

---

[36] Transcript of Day 1 of the arbitration at p. 27, App. 000061.
[37] *Id*.

applied.  In these circumstances, the FAC should apply, including the Florida standard for vacatur.

**B.      Florida law holds that courts must determine the legality of the contract prior to deciding whether to enforce an arbitration award.**

Florida law recognizes that illegality is a compelling reason not to enforce a contract, and "when the issue of a contract's legality is raised, the trial court must make that determination *prior to deciding whether to enforce an arbitral award based thereon.*" *Jupiter Med. Ctr., Inc. v. Visiting Nurse Ass'n of Florida, Inc.,* ___ So. 3d ___, 2011 WL 4056293, *3 (Fla. 4th DCA Sept. 4, 2011) (emphasis added); *See also Party Yards, Inc. v. Templeton*, 751 So.2d 121 (Fla. 5th DCA 2000); *Vacation Beach, Inc. v. Charles Boyd Constr., Inc.*, 906 So.2d 374 (Fla. 5th DCA 2005).[38]

In *Jupiter*, a home health care agency, Visiting Nurse Association of Florida, Inc. ("VNA") purchased Jupiter Medical Center, Inc. ("JMC").  VNA brought an arbitration claim for breach of contract against JMC, and the arbitration panel made an award to VNA.

The sole issue on appeal was "whether the trial court erred in not considering the contract's legality before ordering enforcement of the arbitral award."  The court noted that illegality was "a compelling reason not to enforce a contract." *Id.* (citing *Title & Trust Co. of Fla. v. Parker*, 468 So.2d 520, 524 (Fla. 1st DCA 1985)) (holding that where a "contract contains a clause that is illegal, a court ought not to enforce the illegal term, as a contract cannot give validity to an otherwise illegal act").  The *Jupiter* court then surveyed Florida law, recognizing that "Florida cases indicate a broad refusal to aid the enforcement of illegal contracts." *Id.*   VNA tried to distinguish the case on the basis that the parties had gone

---

[38] The respondents did not learn of PriMed's obligation to have a separate license until shortly before the arbitration and thus could not raise the issue before the state court.

through arbitration. VNA argued that under Fla. Stat. §682.13(1), there were only five circumstances under which a court would vacate an arbitral award, and illegality was not on the list. The Court of Appeals rejected this argument, holding that a prior arbitration would not prevent a trial court from vacating an award based on the breach of an illegal contract: The *Jupiter* court then reversed and remanded, concluding that "[w]hen the issue of a contract's legality is raised, the trial court must make that determination prior to deciding whether to enforce an arbitral award based thereon." *Id.* This Court, consistent with *Jupiter*, should examine the legality of the underlying contract before confirming the Arbitrator's award.

**III.    The Arbitrator acted in manifest disregard of the law, and this ground for vacatur survives *Hall Street Assocs*.**

    **A. The 11ᵗʰ Circuit has held the manifest disregard doctrine did not survive *Hall Street*, but in 2010 the Supreme Court refused to decide the precise issue**.

Although the Eleventh Circuit has eliminated manifest disregard of the law as a basis for vacatur, the doctrine's actual status is in doubt. Previously, the doctrine was well-established, having been implicitly recognized in 1953 when the Supreme Court stated that "the interpretations of the law by the arbitrators ***in contrast to manifest disregard*** are not subject, in the federal courts, to judicial review." *Wilko v. Swan*, 346 U.S. 427, 436 (1953) (overruled on other grounds by *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477 (1989))(emphasis added). After *Wilko*, every Circuit allowed for the vacatur of an award based on an arbitrator's manifest disregard of the law. *Coffee Beanery, Ltd. v. WW L.L.C.*, 300 Fed. Appx. 415, 418-419 (6ᵗʰ Cir. 2008) (citing holdings by all 11 circuits). The Eleventh Circuit recognized the doctrine among other non-statutory grounds for vacatur

under the FAA, along with the grounds that the award was arbitrary and capricious or enforcement would be contrary to public policy. *Montes v. Shearson Lehman Bros., Inc.* 128 F.3d 1456, 1458, 1462-1462 (11th Cir. 1997). As noted above, however, in *Frazier*, 604 F.3d 1313, 1321-24 the Eleventh Circuit interpreted *Hall Street Assocs.,* 552 U.S. 576 as eliminating these three non-statutory grounds for vacatur under the FAA.

*Frazier* is the governing law in this Circuit, and binding on this Court. Yet significantly, the circuits are divided as to whether manifest disregard survives *Hall Street*, and, as discussed further below, the Supreme Court itself last year declined to decide whether the doctrine had survived, even while deciding that if the doctrine were alive, it would apply. *Stolt-Nielsen* 130 S.Ct. 1758, 1768 n. 3. In light of the uncertainty in the state of the law, and in order to preserve the issue for subsequent Eleventh Circuit *en banc* review, Respondents present their argument that even if the FAA applies, the Arbitrator's decision should be vacated on the ground that it evidenced manifest disregard of Florida law although Respondents concede that this Court cannot vacate on those grounds if it finds that the FAA applies.

After *Hall Street*, the Second Circuit held that the manifest disregard of the law standard had survived that decision. *Stolt-Neilsen S.A. v. Animal Feeds*, 548 F.3d 85, 94-95 (2nd Cir. 2008), *rev'd on other grounds,* 130 S.Ct. 1758 (2010). In reversing, the Supreme Court recognized that the Second Circuit had "held that the 'manifest disregard' standard survived our decision in *Hall Street* . . . as a 'judicial gloss' on the enumerated grounds for vacatur of arbitration awards under 9 U.S.C. § 10." 130 S. Ct. at 1766. The Supreme Court chose not to decide whether manifest disregard had survived *Hall Street*, but noted that *if* the standard survived, the arbitrators had been in manifest disregard of the law.

> We do not decide whether 'manifest disregard' survives our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. §10. Animal Feeds characterizes that standard as requiring a showing that the arbitrators "knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." Assuming, arguendo, that such a standard applies, we find it satisfied for the reasons that follow.

130 S.Ct. at 1768, n. 3 (internal citations omitted). The Supreme Court decided that the arbitration panel had exceeded its powers under the FAA by simply imposing "its own view of sound policy regarding class arbitration." 130 S.Ct. at 1767-1768. The Court's opinion demonstrates that manifest disregard of the law may be a ground for vacatur.

Like the Second Circuit, the Ninth Circuit also held that the manifest disregard standard survived *Hall Street*. In *Comedy Club Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009), the Ninth Circuit held that manifest disregard of the law was a ground for vacatur, and "as understood in this circuit to be a violation of § 10(a)(4)" of the FAA, the doctrine had survived *Hall Street.* The *Comedy Club* court further held that in the case before it the arbitrator's ruling was in manifest disregard of the law and thus permitting vacatur.

The Eleventh Circuit in *Frazier* recognized these holdings by the Second and Ninth Circuits, as well as an unpublished decision by the Sixth Circuit, *Coffee Beanery, Ltd. v. WW L.L.C.*, 300 Fed. Appx. 415, 418-419 (6th Cir. 2008). The Sixth Circuit in *Coffee Beanery* held that *Hall Street* "did not foreclose federal courts' review for an arbitrator's manifest disregard of the law, and the Sixth Circuit thought it "worth noting" that, as mentioned above, "since *Wilko*, every federal appellate court has allowed for the vacatur of

an award based on an arbitrator's manifest disregard of the law."  300 Fed. Appx. at 419 (6th

Cir. 2008).   The *Coffee Beanery* Court concluded that "[i]n light of the Supreme Court's

hesitation to reject the 'manifest disregard' doctrine in all circumstances, we believe it

would be imprudent to cease employing such a universally recognized principle."  300 Fed.

Appx. at 419.

### B.  The Arbitrator manifestly disregarded the unequivocal language of §626.903 which prohibited PriMed from bringing an arbitration in Florida.

In *Frazier*, prior to eliminating the manifest disregard doctrine as a ground for

vacatur, the Eleventh Circuit recognized that the doctrine permitted "district courts to vacate

an award where there is 'clear evidence that the arbitrator was conscious of the law and

deliberately ignored it.'"   604 F.3d at 1322, n. 67 (quoting *B.L. Harbert Int'l, LLC v.*

*Hercules Steel Co.*, 441 F.3d 905, 910 (11th Circuit 2000).   The facts of this case satisfy

those factors.

Respondents repeatedly put before the Arbitrator the Florida Statutes that prohibited

PriMed from bringing "any proceeding" in Florida based on its claims under the Contract.

In "Respondents' Motion for Summary Disposition," Respondents explained in detail why

Florida law prohibited maintenance of the arbitration.[39] In Respondent's Joint Post-Hearing

Brief Regarding Liability, Dallas General and Jefferson referred the Arbitrator back to the

arguments in Respondent's Motion for Summary Disposition, but also noted that the

evidence adduced at the arbitration hearing had served to further illustrate why the illegality

of the PriMed program was necessarily dispositive.[40] PriMed admitted that it has never held

---

[39] App. 000091-95.
[40] App. 000115.

a license with the Florida Department of Insurance or the Office of Insurance Regulation.[41] PriMed argued it was a mere "marketer" that was not "operating" the Program.  But, PriMed's "duties and responsibilities" were fixed by the Contract's language and it was evident as a matter of law that PriMed fully intended to operate the program.[42]

Moreover, if PriMed relied as a "marketer" on Coverdell's license, Coverdell itself had been operating without a license in violation of Florida law. Again, §636.903 can hardly be interpreted as allowing an operator that later becomes licensed to institute a proceeding based on events that occurred when they were unlicensed.

Thus, there were only two possibilities for what happened during the relevant period: either PriMed was an unlicensed "operator" as the Contract itself demonstrated, or PriMed was only a "marketer" as PriMed claimed, relying on Coverdell's non existent license. Either way, ***PriMed was operating without a license***, and thus was prohibited by Florida law from brining an arbitration proceeding in Florida. It is undisputed that the Arbitrator was presented with the relevant law.[43]

PriMed also incorrectly argued that the Florida regulatory scheme would be an improper attempt to regulate sales of insurance products to Texas residents.  This argument ignored the purpose the statutory scheme, which was to regulate the operation of companies in Florida that, in exchange for a fee, provided members with access to medical providers offering services at a discount. What determined whether the statutory scheme applied to PriMed was PriMed operating in Florida, not the residency of the individuals who received

---

[41] Hearing Tr. at p. 231:16-17; App. 000156 (Florida Office of Insurance Regulation showing PriMed, Inc. is not licensed to sell discount medical cards.), App. 000058-59.
[42] App. 000115.
[43] See Respondents' Motion for Summary Disposition, App. 000089-97, Respondents' Pre-Hearing Arbitration Br., App. 000098-109, Respondents' Joint Post-Hearing Br. Regarding Liability 000110-132.

the discount card. The Florida Office of Insurance Regulation's investigation made no distinction as to the residency of the members enrolled by Coverdell's private label marketers.[44]

The Arbitrator was presented with a simple statutory scheme that prohibited unlicensed entities such a PriMed from bringing an arbitration in Florida.  Yet despite the law, the Arbitrator issued an award on a case that could not be brought in Florida.  In doing so, the Arbitrator acted in manifest disregard of Florida law.

## CONCLUSION

The arbitrator exceeded his powers under either the FAA or the FAC.  Further, if Florida law governs this arbitration as it should, this Court should examine the legality of the underlying contract before confirming the arbitration award.  Finally, and solely for purposes of preserving error, Dallas General and Jefferson have demonstrated that the Arbitrator acted in manifest disregard of Florida law.  Accordingly, Dallas and Jefferson request that the Court vacate the arbitrator's award.


**JOHNSON, POPE, BOKOR,**
**RUPPEL & BURNS, LLP**

By: /s/ Marion Hale
       MARION HALE
       FBN #441351
       marionh@jpfirm.com
       Post Office Box 1368
       Clearwater, FL 33757
       (727) 461-1818 – tel
       (727) 462-0365 – fax
       Local Counsel for Dallas General Life
       Insurance Company and Jefferson Life
       Insurance Company

---

[44] Market Conduct Final Examination Report at pp. 2-3, App. 000136-137.

**AND**

| QUARLES & BRADY | REID & DENNIS, P.C. |
|---|---|
| By: *Kenneth H. Haney* | By: /s/ William Reid |
| Kenneth H. Haney | William Reid |
| Florida Bar No. 190561 | Texas Bar # 16748500 |
| 1395 Panther Lane | 15660 Dallas Parkway |
| Naples, Florida  34109 | Tollway Towers, Ste 1400 |
| (239) 650-5959 | Tel: (972) 991-2626 |
| (239) 213-5406 | Fax: (972) 991-2678 |
| Counsel for Defendant Dallas | Counsel for Defendant Jefferson |
| General Life Insurance Company | Life Insurance Company |

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of November, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

/s/ *Marion Hale*
Marion Hale